Dear Chairman Burns
¶ 0 This office has received your request for an official Attorney General Opinion in which you ask, in effect, the following question:
In view of the provisions of Article VI, Section 31a of the Oklahoma Constitution, and the decision of the Oklahoma Supreme Court in State ex rel. Board of Regents v. Oklahoma MeritProtection Commission, 19 P.3d 865 (Okla. 2001), does theBoard of Regents for the Oklahoma Agricultural and MechanicalColleges have independent authority to establish procedures forobtaining design consultant services and to make awards ofcontracts to persons or entities to provide such services to theBoard of Regents, notwithstanding the provisions of 61 O.S.1991 Supp. 2000, §§ 60-65?
¶ 1 In essence you ask: Does application of the procedures established at 61 O.S. 1991 Supp. 2000 §§ 60-65 for selecting design consultants for construction projects under the jurisdiction of the Board of Regents for the Oklahoma Agricultural and Mechanical College and all Agricultural and Mechanical Colleges ("AM Regents"), impermissibly interfere with the Board of Regents' constitutional powers provided for at Article VI, Section 31a of the Oklahoma Constitution?
 I. Constitutional Powers Of The Board Of Regents Of Oklahoma State University And The Oklahoma AM Colleges A. Oklahoma Supreme Court's Conclusion That the Board of Agriculture — Acting as the AM Board of Regents — was Vested with the Same Powers Vested in the Territorial Board of Regents, Including the Power of "Supervision or Charge of the Construction of all Buildings."
¶ 2 An issue similar to the one presented in your Opinion request was considered by the Oklahoma Supreme Court shortly after statehood in Trapp v. Cook Construction Co., 105 P. 667
(Okla. 1909). Under consideration in that case was a contract entered into for the construction of certain buildings to be used by the Agricultural Mechanical College. When presented with the statement for sums due the construction company for work on those buildings, the State Auditor, M.E. Trapp, refused to issue a warrant for the amount due. The sole reason given for his refusal "was that the said voucher had not been approved by the state board of public affairs." Id. at 668-69. That Board, under the provisions of 1909 Okla. Sess. Laws ch. 37, § 4, was given "charge of the construction, repair, maintenance, insurance and operation of all buildings owned, used or occupied by or on behalf of the state[.]" In Trapp the Court stated that under Section 6 of the 1909 Law, "[a]ll claims against the state for any of the items mentioned in this act, shall, before payment, be presented in the form required by said board and be audited andapproved by said board under such rules and regulations as they may prescribe." Id. at 669 (emphasis added).
¶ 3 At that time, under the provisions of Article VI, Section31 of the Oklahoma Constitution, the Board of Agriculture served as the Board of Regents for the Agricultural and Mechanical Colleges. In pertinent part, Article VI, Section 31 of the Oklahoma Constitution provided:
 Said Board [The Board of Agriculture] shall be maintained as a part of the State government, and shall have jurisdiction over all matters affecting animal industry and animal quarantine regulation, and shall be the Board of Regents of all State Agricultural and Mechanical Colleges. . . .
Okla. Const. art. VI, § 31 (emphasis added).
¶ 4 The Supreme Court found that this language in Article VI, Section 31, vested in the Board of Agriculture — acting as the Board of Regents — "the same power, jurisdiction, and authority that was possessed by the board of regents of the agricultural and mechanical college at the time of the adoption of the Constitution." Trapp, 105 P. at 667 (Syllabus of the Court).
¶ 5 The Court went on to hold that the 1909 legislation, as applied to the AM Regents, was void:
 [S]o far as it attempts to confer upon the board of public affairs the powers and duties vested in the board of regents of the state agricultural and mechanical college as the same were conferred by the Constitution, is void.
Id.
¶ 6 The Court thus concluded that the application of the provisions of the legislative enactments which required approval of the board of regents' construction expenditures by the State Board of Public Affairs was an attempt by the Legislature to impermissibly take away duties vested in the board by the Constitution. The Court phrased the issue and its conclusion in the following language:
 The question then is: Did the board of agriculture, being constituted the board of regents of the agricultural and mechanical college, thereby have
fixed and vested in it, by the language used, the duties, powers, and authority of the established territorial board of regents whose place it took, as the same existed at the time of the adoption of the Constitution? If so,, necessarily the Legislature could not divest it of these powers nor any part thereof, for, if it could lawfully take a part, it could from time to time take more, and ultimately take all, and thereby defeat the will of the people who fixed the status of this board in the organic law of the state. As we view it, additional duties may be required, but none vested by the Constitution may be taken away by the Legislature.
Trapp, 105 P. at 668 (emphasis added).
¶ 7 The powers of the Territorial Agricultural and Mechanical College Board of Regents, as held by the Oklahoma Supreme Court in Trapp, were provided for at Article 18, ch. 77 of Wilson's Rev. Ann. St. Okl. 1903. Trapp, 105 P. at 667. At Section 287, those 1903 territorial provisions specifically vest the Territorial Board of Regents with the supervision of the construction of all buildings provided for the AM College:
 The said Board of Regents shall direct the dispositions of all moneys appropriated by the Territorial Legislature or by Congress, or funds arising from the sale of bonds provided for in this act for the Agricultural College or Experimental Station for Oklahoma Territory, and shall have supervision or charge of the construction of all buildings provided for said College or Farm. The Board of Regents shall have power to employ a president and necessary teachers, instructors and assistants to conduct said school and carry on the Experimental Farm connected therewith, and to appoint a superintendent of construction of all buildings. . . .
Okla. Rev. Ann. Stat. ch. 77, art. 18, § 287 (1903) (emphasis added).
¶ 8 That same section of the 1903 enactment specifically allowed for expenditures upon the approval of the board of regents:
 The said board shall audit all accounts against the funds appropriated for the use of the Agricultural College and Experimental Station, and the Territorial Auditor shall issue his warrant upon the Territorial Treasurer for the amount of all accounts which shall have been audited and allowed by the Board of Regents and attested by the president and secretary of the same.
Id. (emphasis added).
¶ 9 It was in light of these duties vested in the Territorial Board of Regents — which the Trapp Court held, as a matter of constitutional law, were vested in the Board of Agriculture, acting as the AM Board of Regents — that the Court held the statutory procedures which required approval by the State Board of Public Affairs could not be applied to construction projects of the Board of the AM Regents.
 B. The 1944 Enactment of Article 6, Section 31a of the Oklahoma Constitution, Which Created a New Board of Regents for the Oklahoma Agricultural and Mechanical Colleges and all Agricultural and Mechanical Schools and Colleges, Vested That Board With the Same Powers as Those Vested in the Board of Agriculture, Acting as the AM Board of Regents.
¶ 10 In 1944, with the adoption of State Question No. 310, the people of the State of Oklahoma added a new section to the Oklahoma Constitution, Article VI, Section 31a. That new provision of the Constitution created the Board of Regents for the Oklahoma Agricultural and Mechanical College and all Agricultural and Mechanical Schools and Colleges "maintained in whole or in part by the State." Id.
¶ 11 Attorney General Opinion 83-234, after noting that the provision of Section 31a of Article VI made no mention of the powers and authorities of the new AM Board of Regents, held that the new Board was vested with the same powers and duties as those found to be possessed by the Board of Agriculture in the Trapp
decision:
 The above provision makes no mention as to the powers and authority of the new A M Board. Thus, under the rule of law enunciated in Trapp, supra, such A M Board would clearly have the same powers and authority as that possessed by the previous A M Board as of the date of the adoption of this constitutional provision, i.e., July 11, 1944.
 At the very least, under the analysis in Trapp, supra, § 31a vested in the new A M Board all powers and authority which were vested in the previous A M Board at the time of the adoption of the Constitution in 1907, and which were the same powers and authority possessed by the statutory A M Board prior to Statehood and the adoption of the Constitution.
Id. at 443-44 (emphasis added).
¶ 12 More recently, in Attorney General Opinion 95-12, we came to a like conclusion, holding that the hiring freeze provisions of 74 O.S. Supp. 1995, § 840-2.14[74-840-2.14](D) could not be imposed upon the institutions governed by the three constitutionally-created boards of regents. A.G. Opin. 95-12 at 24. In concluding that the separately-created AM Board of Regents was vested with the same constitutional powers as those vested in the Board of Agriculture, we stated:
 The enactment of Section 31a of Article VI by the people in 1944, as noted above, was an amendment to Section 31 of that article. Viewed in such light, the effect of the amendment was to bestow the powers of the Board of Regents — powers once exercised by the Board of Agriculture — upon the separately-created Board of Regents. Thus, the separately-created Board of Regents was vested with the same constitutional powers as those vested in the Board of Agriculture when it acted in that capacity.
Id. (emphasis added).
¶ 13 Under the analysis used in Trapp, the separate Board of AM Regents created in Article 6, § Section 31a was thus vested with all the powers vested in the Territorial Board of Regents, including the "supervision or charge of the construction of all buildings" and the appointment of a superintendent of construction of all buildings. Okla. Rev. Ann. Stat. ch. 77, art. 18, § 287 (1903). Additionally, among the powers vested in the Board of Regents under the territorial law was the "government and management" of the agricultural and mechanical college. Trapp, 105 P. at 666.
¶ 14 It is in light of these constitutional powers that you ask us to consider the applicability of the statutory procedures for contracting for the services of design consultants under the provisions of 61 O.S. 1991 Supp. 2000, §§ 60 — 65.
 II. Statutorily Mandated Procedures For Contracting For The Services Of Design Consultants Imposed By 61 O.S. 1991 Supp. 2000, §§ 60-65, And Related Statutes A. Required Use of Contract Forms Prescribed by the Department of Central Services.
¶ 15 At 61 O.S. Supp. 2000, § 60[61-60], the Legislature requires that all State entities and officers use contract forms prescribed by the Department of Central Services when contracting for the services of a design consultant:
 All state agencies, boards, commissions, offices, institutions, and other governmental bodies of this state, and all individuals representing such entities, shall use consultant and construction contract forms that the Director of the Department of Central Services requires to award contracts for designs to construct, renovate, alter, repair, maintain, or improve real property or fixtures of real property of the state. The Director of the Department of Central Services may authorize, in writing, exceptions to the use of consultant and construction contract forms.
Id. (emphasis added).
¶ 16 In addition to requiring that prescribed contract forms be used, the Legislature at 60 O.S. Supp. 2000, § 62[60-62], prescribes the procedure that all State entities are to use in contracting for construction management and design consulting services.
 B. Decision-making Powers Vested in the Department of Central Services in the Mandated Procedures to Be Used in Contracting for Construction Management and Design Consulting Services.
¶ 17 At 61 O.S. Supp. 2000, § 61[61-61], the Legislature defines two key terms, as those terms are used in Sections 61-65: "Construction manager" and "Design consultant." "Design consultant" is defined to mean:
 [A]n individual or legal entity possessing the qualifications to provide licensed architectural, registered engineering, or registered land surveying services for a public work improvement project[.]
Id. § 61(4).
¶ 18 The term "Construction manager" is defined to mean:
 [A]n individual, firm, corporation, association, partnership, copartnership, or any other legal entity possessing the qualifications to provide services of construction management which include, but are not necessarily limited to, design review, scheduling, cost control, value engineering, constructability evaluation, preparation and coordination of bid packages, and construction administration[.]
Id. § 61(2).
¶ 19 Also defined in Section 61 is the term "State agency" which is defined to mean:
 [A]n office, officer, bureau, board, counsel, court, commission, institution, unit, division, or body of the executive or judicial branches of state government, whether elected or appointed,
excluding only political subdivisions of the state[.]
Id. § 61(8) (emphasis added).
¶ 20 As the AM Board of Regents is a board of the Executive Branch of Government composed of appointed members, the Board falls within the statute's definition of "State agency."
¶ 21 Under the procedures established in Section 62(A) of Title 61, the Department of Central Services maintains a file of "all persons and entities interested in and capable of performing construction management and design consultant services for state agencies." Id. Additionally, the Construction and Properties Division of the Department of Central Services determines "whether a construction manager or design consultant qualifies for registration." Id.
¶ 22 State agencies wishing to begin a construction project are required by 61 O.S. Supp. 2000, § 62[61-62](B), to define the scope of the proposed construction project. They then send the proposal with a requisition for construction management or design consultant services to the Construction and Properties Division, which must review the scope of the proposed project andapprove it before the State agency can proceed further:
 The requisitioning state agency shall define the scope of a proposed project. The scope shall identify project components, phases, and timetables and shall include detailed project descriptions. The state agency may request the Division to assist with scope development. The state agency shall send the scope and a requisition for construction management or design consultant services, signed by the chief administrative officer, to the Division. The Division shall review the scope and approve it before the state agency issues a solicitation.
Id. (emphasis added).
¶ 23 Under the statutory procedure, once the Division of Construction and Properties approves the scope of the proposed construction project, the agency is next required to issue a solicitation to construction managers and design consultants. 2001 Okla. Sess. Laws ch. 298, § 1 (amending 61 O.S. Supp. 2000,§ 62[61-62](C)). The statute requires that "[t]he solicitation shall, at a minimum, contain" the following:
1. Description and scope of the project;
 2. Estimated construction cost or available funds, anticipated starting date, and completion date the state agency desires for the project;
 3. Certification of funds available for the construction manager or design consultant fee, including federal, state or other participation;
 4. Closing date for construction manager or design consultant to give notice of interest to the state agency; and
 5. Additional data the state agency requires from the construction manager or design consultant. The closing date for submission of construction manager or design consultant notice of interest for consideration shall be within thirty (30) days of the date of the notice the state agency issues.
Id.
¶ 24 After the closing date for receiving solicitations, the Director of the Construction and Properties Division provides "information from the construction managers' or design consultants' files to the state agency." Id. § 62(D). The statutorily mandated procedure next requires the requesting State agency to review the information "the Division provides" and "select no less than three and no more than five consultants per contract for interviews." Id. § 62(E). The statute then mandates the minimum requirements of the agency's review:
 The review shall include consideration of factors from the information the Division supplies:
 1. Professional qualifications for the type of work contemplated;
 2. Capacity for completing the project in the specified time period; and
3. Past performance on projects of a similar nature.
Id. (emphasis added).
¶ 25 The next step in the mandatory process requires that the Division advise the requesting State agency "of the methods to be used to conduct the evaluation, interview, selection, contract negotiation, and fee negotiation processes pursuant to rulespromulgated by the Department of Central Services."
2001 Okla. Sess. Laws ch. 298, § 1 (amending 61 O.S. Supp.2000, § 62[61-62](F)) (emphasis added).
¶ 26 The Department of Central Services Administrative Rule, OAC 580:20-3-4, deals with the selection process mandated at 2001 Okla. Sess. Laws ch. 298, § 1. At subsection (f), that Rule specifically provides how the evaluating interviewing process is to be conducted. Under the procedure, the governing board or head of the agency is required to designate an interview committee, and all members of the interview committee must participate in all interviews of each consultant. OAC 580:20-3-4(f)(1) (1999). The Rule then requires that the agency develop "[a]n evaluation criteria list," to "insure that all interviews are conducted identically." Id. 20-3-4(f)(2).
¶ 27 Further, the interview committee is required to consider the criteria listed in Rule OAC 580:20-3-7(a). Additionally, Rule OAC 580:20-3-7(a) provides:
 The interview is the most important step in the selection process. Each consultant must be evaluated against a clearly established list of criteria which is provided to the consultant within seven days in advance of the interview. It is recommended that an interview evaluation sheet be made up for each consultant being interviewed. . . .
Id.
¶ 28 At the completion of the interview selection and negotiation process, under the provisions of 2001 Okla. Sess. Laws ch. 298, § 1 (amending 61 O.S. Supp. 2000, § 62[61-62](G)), "the Division [the Construction Properties Division of the Department of Central Services] shall approve and award thecontract." Id. (emphasis added).
¶ 29 The full impact of the Department of Central Services' powers under the procedural requirements imposed upon State agencies under Section 62 of Title 61 is made even clearer when the procedures are viewed in light of its companion legislation —61 O.S. Supp. 2000, § 208[61-208]. That section makes it clear thatthe key decisions in the process are all made by theConstruction and Properties Division of the Department ofCentral Services:
 A. The Construction and Properties Division of the Department of Central Services shall approve state agency selection of, and award contracts to, construction managers and design consultants pursuant to the provisions of Section 62 of this title.
 A. The negotiation of construction manager and design consultant contracts and fees shall be performed by the Division.
 C. The Division shall award and administer construction contracts for state agencies pursuant to the provisions of the Public Competitive Bidding Act of 1974.
Id. (emphasis added).
 III. Application Of The Statutory Procedures For Contracting For The Services Of Design Consultants To Construction Projects Under The Jurisdiction Of The AM Board Of Regents, Impermissively Interferes With The Board's Constitutional Powers To Be In Charge Of And Supervise Construction Under Its Jurisdiction.
¶ 30 As noted above, in addition to the specific power of "supervision or charge of the construction of all buildings" the AM Board of Regents — like its sister, constitutionally-created Boards of Regents — is also vested with the power of the "government and management" of the schools and institutions over which it has jurisdiction. Trapp, 105 P. at 666. Two decisions of the Oklahoma Supreme Court have recognized that the purpose of constitutionally vesting the Boards of Regents with power over the "government" of the universities under their charge, was to remove the State universities from the plenary control of the Legislature. In the first such case, Board of Regents v. Baker,638 P.2d 464 (Okla. 1981), the Oklahoma Supreme Court held that, in elevating the status of the Board of Regents "from a statutory to a constitutional entity the people intended to limit legislative control over University affairs." Id. at 467.
¶ 31 The Board of Regents in Baker challenged a joint resolution enacted by the Legislature which directed that all State agencies, including the Board of Regents, increase the salaries of all employees by six percent (6%) for the upcoming fiscal year. Finding that the legislative establishment of employee raises impermissibly interfered with the Board of Regents' constitutional power over the university's general government, the Supreme Court stated:
 We believe the finding by the trial court that the Legislature may fix and determine the manner in which raises are to be given to employees of the Board of Regents was erroneous. The determination of salary schedules and the compensation to be paid to the employees of the Board of Regents is an integral part of the general government of the University.
Id. at 468 (emphasis added).
¶ 32 In reaching this conclusion, the Oklahoma Supreme Court quoted with approval from San Francisco Labor Council v. Regentsof the University, 608 P.2d 277 (Cal. 1980). In that case, the Court concluded that under the California Constitution, a legislative enactment which attempted to fix minimal salary rates for certain employees at institutions under the Board of Regents of the University of California violated the constitutional provisions establishing the independence of the university. In so ruling, the California Supreme Court noted that the Regents are not completely free from legislative regulation, as there were three areas of permissible legislative regulation. Baker,638 P.2d at 468.
¶ 33 In Baker, the Oklahoma Supreme Court noted, with approval, from the California Supreme Court's discussion of those areas:
 In addition to the specific provisions in Article IX, sec. 9, Calif. Const., California courts have recognized three areas of permissible legislative regulation. First, the Legislature's power of appropriation prevents the Regents from compelling appropriations for salaries. Second, general police power regulations governing private persons and corporations may be applied to the University. Third, legislation regulating public agency activity not generally applicable to the public may be made applicable to the university when the legislation regulates matters of statewide concern not involving internal university affairs.
Id. (emphasis added).
¶ 34 The Court in Baker went on to conclude that the determination of faculty salary was an integral part of the power to govern a university and thus beyond the Legislature's ability to regulate:
 We find that Article XIII, s 8, of the Oklahoma Constitution establishes the Board of Regents of the University of Oklahoma as an independent body charged with the power to govern the University.
While constitutionally assured independence cannot be equated with complete immunity for legislative regulation, it is unnecessary for us to fully examine here the nature and extent of legislative regulation applicable to [the] Board. The determination of faculty salaries is clearly an integral part of the power to govern the University and a function essential in preserving the independence of the Board.
. . . .
 Decisions about the level and manner of distributing salary increases directly relate to and affect judgments on individual needs and performance as well as institutional needs and resources. The increase in salary provisions in SJR9 substantially interferes with [the] Board's authority to make those judgments, and are, therefore, in conflict with Article XIII, s 8.
Id. at 469 (emphasis added).
¶ 35 In State ex rel. Board of Regents v. Oklahoma MeritProtection Commission, 19 P.3d 865 (Okla. 2001), the Oklahoma Supreme Court once again considered the limits on legislative regulation of University affairs. Specifically, the Court considered the power of the Oklahoma Merit Protection Commission to prosecute a Whistle Blower Act complaint brought against the AM Regents and University President Ernest L. Holloway. In an action before the Merit Protection Commission, a university employee sought to have his termination set aside, claiming that the University President had violated his rights under the whistle blower statutes, 74 O.S. Supp. 2000, §§ 840-2.5[74-840-2.5] and 840-2.6. One of the remedies available under the Whistle Blower Act — if the Court finds a knowing and willful violation — is the forfeiture of the position of the supervisor or appointing authority who violated the Act. Id. § 840-2.5(F). Thus, in the AM Regents' case, had the Merit Protection Commission proceeded to exercise jurisdiction over the complaint against the AM Board of Regents and President Holloway, the Board, under a proper finding, could not only have reinstated the terminated employee, but also could have forfeited President Holloway's position.
¶ 36 In holding that the Merit Protection Commission was without jurisdiction over the grievance tendered against the AM Board of Regents and President Holloway, the Oklahoma Supreme Court found that under the provisions of Article VI, § 31a, the AM Board of Regents was empowered "to conduct the internal affairs of their subordinate institutions of higher learningfree of any interference by the Oklahoma Merit Protection Commission. The Legislature is powerless to delegate thepetitioners' constitutional control over the management of theirinstitutions to any department, commission or agency of stategovernment." Merit Prot. Comm'n, 19 P.3d at 866 (second emphasis added).
¶ 37 In sum, in Baker the Court found that the determination of faculty salaries was clearly an intregal part of the power to govern the university which was essential to the independence of the Board of Regents (Baker, 638 P.2d at 468), and in MeritProtection Commission the Court held that hiring and firing decisions were within the fundamental-law power clearly within the exclusive authority granted to the Regents under the Constitution. Merit Prot. Comm'n, 19 P.3d at 866.
¶ 38 Your Opinion request requires us to determine whether the legislatively-imposed procedure for obtaining the services of design consultants — which vests the Department of Central Services with all key decision-making power — can be constitutionally applied to the construction of buildings under the AM Board of Regents' jurisdiction. Because of the specific constitutional powers conferred upon the AM Board of Regents to "have supervision or charge of the construction of all buildings" (Okla. Rev. Ann. Stat. ch. 77, art. 18, § 287 (1903)) for institutions under its jurisdiction, we conclude that application of the statutory procedural requirements to AM Regents' construction projects impermissibly interferes with the Regents' constitutional powers.
¶ 39 The application of those provisions to the AM Board of Regents is impermissible because the statutory procedures vest the Department of Central Services or its Division of Construction and Properties with approval and decision-making authority over the AM Regents' construction projects. As noted above, those provisions mandate that all State agencies use contract forms prescribed by the Department, and that agencies may only use other contract forms with the written authorization of the Director of the Department of Central Services. 61 O.S.Supp. 2000, § 60[61-60].[1] Under this requirement, it is the Department and its Director that determine the terms and conditions of the construction contracts. In the case of construction of buildings under the AM Board of Regents' jurisdiction, the Constitution vests such power in the Board of Regents.
¶ 40 Further, under the statutorily mandated contracting procedures, it is the Division of Construction and Properties — not the Regents — that reviews and approves the scope of a construction project. 61 O.S. Supp. 2000, § 62[61-62](B). It is also the Division that determines whether a design consultant or construction manager is qualified. Id. § 62(A). Additionally, under the mandated statutory procedures, it is the Division that approves, awards and administers construction contracts. 2001 Okla. Sess. Laws ch. 298, § 1 (amending 61 O.S. Supp. 2000, §62[61-62](G)); 61 O.S. Supp. 2000, § 208[61-208](A), (C).
¶ 41 However, such decisions, under the specific constitutional powers granted the AM Board of Regents to have "supervision or charge of the construction of all buildings," Okla. Rev. Ann. Stat. ch. 77, art. 18, § 287 (1903), are decisions which must lie exclusively with the AM Board of Regents. Because the statutorily mandated procedures leave all major construction decisions to the Department of Central Services, we conclude that application of those procedures to construction projects of the AM Board of Regents impermissibly interferes with the specific constitutional power of that Board to have "supervision or charge" over construction projects and buildings at institutions within its jurisdiction.
¶ 42 In reaching this conclusion, we make no decision with respect to the other constitutionally-created Boards of Regents, because our decision is based on the specific constitutional powers found to be vested in the Board by the Oklahoma Supreme Court in Trapp, discussed at length above.[2]
¶ 43 Nor do we hold that application of the provisions of 61O.S. Supp. 2000, § 63[61-63], or 61 O.S. 1991, § 64[61-64] to construction projects under the AM Board of Regents' jurisdiction impermissibly interferes with the Board's power. Section 63 merely requires that construction plans and drawings "paid for in whole or in part with state funds" are to be filed for inclusion in the library system maintained by the Department of Central Services. 61 O.S. Supp. 2000, § 63[61-63]. Section 64 makes it a crime for contractors or builders of public buildings to offer gratuities or political contributions to any consultant doing engineering work for the State of Oklahoma, or to attempt to interfere with competitive bidding processes of the State. 61O.S. 1991, § 64[61-64]. Application of those provisions to construction projects under the AM Board of Regents' jurisdiction does not interfere with the Board of Regents' exercise of their constitutional powers, because they do not interfere with the Regents' construction project decisions. Accordingly, these statutory provisions may be applied to those projects.
¶ 44 It is, therefore, the official Opinion of the AttorneyGeneral that:
 1. Under the provisions of Article VI, § 31a of the OklahomaConstitution, the Board of Regents for the Oklahoma Agriculturaland Mechanical College and all Agricultural and MechanicalSchools and Colleges (the AM Board of Regents) is vested withthe same power, jurisdiction and authority possessed by theTerritorial Board of Regents of the Agricultural and MechanicalColleges at the time of the adoption of the OklahomaConstitution. Those powers, in addition to the power of"government and management" of all schools and institutionswithin its jurisdiction, specifically include the "supervision orcharge of the construction of all buildings" and the appointmentof "a superintendent of construction of all buildings." Okla.Rev. Ann. Stat. ch. 77, art. 18, § 287 (1903).
 2. The statutorily mandated procedures for contracting for theservices of design consultants imposed by 61 O.S. 1991 Supp.2000, §§ 60-65, provide in pertinent part that:
 a. All State agencies must use consulting and constructioncontract forms prescribed by the Director of the Department ofCentral Services and may only use differing forms if they securewritten approval of the Department's Director;
 b. State agencies may only contract with design consultants —individuals or entities qualified to provide licensedarchitectural, registered engineering or land surveying services— that the Department of Central Services finds are qualified;
 c. The Division of Construction and Properties of theDepartment of Central Services must review and approve the scopeof all proposed agency construction projects;
 d. State agencies must review and evaluate all proposals bydesign consultants under rules promulgated by the Department ofCentral Services, and at a minimum, use evaluation criteriaestablished in those rules. Further, under Department of CentralServices' Administrative Rule OAC 580:20-3-4(h), at the end ofthat review process, the requesting agency must submit a reportof its interview process and recommendations to the Division forits independent review of the entire process, and
 e. At the conclusion of the interview and negotiation process,proposed contracts must be sent to the Construction andProperties Division of the Department of Central Services for itsapproval and award of the contract.
 3. Under the provisions of a companion statute, 61 O.S.Supp. 2000, § 208(A), the Construction and Properties Divisionof the Department of Central Services "shall approve state agencyselection of, and award contracts to, construction managers anddesign consultants pursuant to the provisions of Section 62 ofthis title." Additionally, under Section 208, it is the Divisionof Construction and Properties of the Department of CentralServices that performs the "negotiation of construction managerand design consultant contracts," and the Division that "award[s]and administer[s] construction contracts." Id. § 208(B),(C).
 4. The statutorily mandated procedures (61 O.S. 1991 andSupp. 2000, §§ 60, 61, and 2001 Okla. Sess. Laws ch. 298, § 1(amending 61 O.S. Supp. 2000, § 62), and 61 O.S. Supp.2000, § 208) for the selection and contracting for services ofdesign consultants and construction managers, and rulespromulgated by the Department of Central Services under theprovisions of those statutes, may not constitutionally be appliedto construction projects under the jurisdiction of the Board ofRegents for the Oklahoma Agricultural and Mechanical College andall Agricultural and Mechanical Schools and Colleges, because theapplication of those statutory requirements to the AM Board ofRegents' construction projects would impermissibly interfere withthe specific constitutionally-vested powers of the Board ofRegents to "have supervision or charge of the construction of allbuildings." Okla. Rev. Ann. Stat. ch. 77, art. 18, § 287(1903).
 5. Application of the provisions of 61 O.S. Supp. 2000, §63, which in part require that drawings, plans, specificationsand models provided by design consultants to State agencies, paidfor in whole or part with State funds, shall be filed forinclusion in the library system maintained by the Department ofCentral Services does not impermissibly interfere with theconstitutional powers of the Board of Regents for the OklahomaAgricultural and Mechanical College and all Agricultural andMechanical Schools and Colleges.
 6. The application of provisions of 61 O.S. 1991, § 64,which make it a crime for contractors or builders on any publicbuilding or works to offer gratuities or political contributionsto any consultant doing engineering work for the State, andattempting to interfere with competitive bidding processes toconstruction projects under the jurisdiction of the Board ofRegents, does not impermissibly interfere with the constitutionalpowers of the Board of Regents of Oklahoma Agricultural andMechanical College and all Agricultural and Mechanical Schoolsand Colleges.
W.A. DREW EDMONDSON ATTORNEY GENERAL OF OKLAHOMA NEAL LEADER SENIOR ASSISTANT ATTORNEY GENERAL
[1] Our conclusion today is consistent with the conclusion reached in Attorney General Opinion 83-234 which held that the statutory provisions in Section 60 which required State agencies to use consulting contract forms developed by the State Construction Administrator were facially constitutional. We further concluded in that Opinion that depending on the facts and circumstances of any given case, the statute "could be unconstitutional in its application if its implementation interferes with or limits any of the constitutional powers of the Board of Regents for Oklahoma State University and Agricultural and Mechanical Colleges." Id. at 446. We then indicated that whether the Board's constitutional powers were impermissibly interfered with was a question of fact.
Our analysis today goes a step further. We find that the provisions in Section 60 of Title 61, which, through the use of required contract forms, dictate the terms and conditions of construction, impermissibly interfere with the Board of Regents' power to determine for itself the terms and conditions of its construction contracts.
[2] Attorney General Opinion 87-7, which dealt with the lease-purchasing of data processing equipment, viewed the Trapp
decision and rationale to have been limited by the Court's opinion in Baker. A.G. Opin. 87-7 at 19. Baker, however, did not deal with the AM Board of Regents, nor did it deal with the AM Regents' specific constitutional powers of "supervision or charge of the construction of all buildings." Nothing in Opinion No. 87-7 dealt with these specific constitutional powers of the AM Regents or with the Baker decision's effect on those specific constitutional powers.